# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE SESSION, 1997

**FILED**

**September 10, 1997**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 02C01-9612-CC-00451** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **GIBSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. J. STEVEN STAFFORD** |
| **DOYLE HART,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Writ of Error Coram Nobis) |

## ON APPEAL FROM THE JUDGMENT OF THE CIRCUIT COURT OF GIBSON COUNTY

<u>FOR THE APPELLANT</u>:

CHARLES S. KELLY
P.O. Box 507
802 Troy Avenue
Dyersburg, TN 38025-0507

<u>FOR THE APPELLEE</u>:

JOHN KNOX WALKUP
Attorney General and Reporter

ELIZABETH T. RYAN
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

CLAYBURN L. PEEPLES
District Attorney General
110 South College Street
Suite 200
Trenton, TN 38382

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Doyle Hart, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure from the trial court's denial of his petition for a writ of error coram nobis. The Defendant filed his petition for a writ of error coram nobis on November 24, 1993, contending that his convictions for aggravated rape and incest should be set aside because of newly discovered evidence. A hearing was conducted on the petition on April 8, 1994. At the conclusion of that hearing, the trial court denied the petition. On appeal to this Court, the judgment of the trial court was reversed and the case was remanded for a new hearing.[1] A new hearing was conducted on July 8, 1996. In a memorandum opinion filed on July 18, 1996, the trial court denied the petition. It is from this order of denial that the Defendant now appeals. We affirm the judgment of the trial court.

We begin with a discussion of the circumstances of the Defendant's offenses. As we stated above, the Defendant was convicted of aggravated rape and incest. The victim was the Defendant's stepdaughter.[2] Although only a small portion of the trial testimony is included in the record before us, we can glean the following facts from this Court's opinion in the Defendant's direct appeal:

> The nine-year-old victim testified that on numerous occasions the defendant had sexually abused her. She explained that the defendant, who was her stepfather, would come into her bedroom after making sure that her mother was asleep, remove his pants and

---

[1] See State v. Hart, 911 S.W.2d 371 (Tenn. Crim. App. 1995) (holding that the denial of the petition must be reversed because the trial court considered evidence outside the record in denying the petition).

[2] It is the policy of this Court not to refer to minor victims of sexual abuse by name. Accordingly, we will refer to the Defendant's stepdaughter only as "the victim" throughout this opinion.

underwear, pull back the covers from her, slip down her panties, get on top of her, and begin moving "up and down." She testified that the defendant had inserted his penis in her vagina for a short distance. While using different terminology, she further stated that the defendant had usually ejaculated. According to the victim this happened on over twenty occasions and on one occasion blood came from her vagina. She also related that the defendant had improperly touched her with his hands on various occasions at their home and while she had been with the defendant in his motor vehicle.

On cross-examination the victim admitted that she had told an untruth about her stepmother striking her and pulling her hair. The child then acknowledged that she had been hospitalized in Memphis for five or six weeks because of this "lie" and because she did not trust her stepmother. In addition, the victim was questioned by defense counsel concerning numerous inconsistent statements which she had made at the preliminary hearing and statements which she had made to other individuals concerning the date of the first sexual penetration by the defendant. Testifying at the preliminary hearing, the victim had evidently stated that this had occurred after her seventh birthday; however, she had told numerous individuals that the penetration had occurred on the day after her eighth birthday. We note that on redirect examination the victim concluded that the first penetration had, in fact, occurred after her seventh birthday rather than after her eighth birthday. Defense counsel questioned the victim extensively concerning other prior inconsistent statements. During this questioning the victim admitted to having falsely accused her stepbrother of sexual misconduct on one occasion. She also acknowledged that she wanted her mother and father to remarry.

In addition to the victim, the State offered Jerri Jackson, the victim's stepmother. This witness testified that on several occasions the victim had complained to her of pain and that she had observed redness and swelling around the victim's vagina. Jackson further testified that the victim had been sent to Lakeside Hospital because of problems which the victim had been having at school and home. The victim was allegedly having particular difficulty accepting disciplinary action. According to this witness false allegations made against her by the victim had not lead to the victim's hospitalization but rather the victim's overall behavioral problems. This witness further testified that the redness and swelling which she had noticed around the victim's vagina had disappeared about three weeks after the victim had begun living with her and the victim's father.

The State also called two medical doctors who testified that they had found trauma to the vaginal opening. This trauma was said to have indicated the introduction of a foreign object and was not usually consistent with self-abuse. Both doctors related that in their opinions penetration of one-half inch up to one inch or an inch

and one-quarter would probably not have ruptured the victim's hymen.

At the conclusion of the State's proof, the defendant moved for a judgment of acquittal. This was denied; however, two counts of a four count indictment were dismissed with the consent of the State. After this dismissal the State elected to proceed on one incident which related to the occasion when the victim had allegedly bled.

The victim's mother testified on behalf of her husband, the defendant. She stated that after she had given birth to the defendant's son, the victim's relationship with the defendant had deteriorated. Furthermore, according to this witness the victim walked into the bedroom on one occasion while this witness and the defendant were engaged in sex, and, upon seeing them, had become hysterical. The mother also related that during the period of time in which these events were alleged to have occurred, the defendant had not returned from work until shortly after midnight each evening. She added that she had waited up for her husband and had always talked with him while he ate. The witness then concluded that these alleged offenses could not have happened on twenty separate occasions as the victim claimed, especially since the parents' and the victim's bedroom doors were so close to one another.

In addition, the witness related that the victim had frequently experienced nightmares, had made an allegation of improper sexual conduct by one of her stepbrothers, and had allegedly told her father previously that her stepbrother had abused her. The mother then added that while bathing the victim around the time of the alleged offenses, she had observed no problem in the victim's vaginal area except for redness and rawness which the victim had experienced each summer.

According to this witness' further testimony she had attended family therapy while the victim had been at Lakeside, that the victim had been caught being untruthful while in the hospital, that the only occasion where blood had been observed on the victim's panties had been when the victim returned from a visit with her father and stepmother, and that the victim had frequently fantasized about events. On cross-examination this witness admitted that she had waited for two weeks before telling the victim's father about the complaint made against the victim's stepbrother, that she had never taken the victim to the doctor and that she had not examined the victim. According to this witness the victim had never made any accusations except to tell her that "it felt like somebody was touching her down there with their tongue and it must be the defendant because he was the only one there."

Sherry Donald, a social worker at the local mental health center, testified that she had talked to officials at Lakeside Hospital two months prior to trial but had not received the hospital report. Out of the jury's presence she testified that she had been informed by hospital officials that the victim did lie frequently and was having problems with her sexuality. Donald further stated that she had been told that the victim fantasized, had a problem with reality, was very manipulative, and had an ultimate goal of reuniting her mother and father.

However, the trial court granted the State's objection and refused to allow this witness to testify concerning the information which she had obtained by telephone from Lakeside Hospital. While this testimony was excluded, she was allowed to introduce a statement which she had taken from the victim. This statement contained several inconsistencies with the victim's trial testimony.

Testifying in his own behalf, the defendant denied that he had ever committed any type of sexual offense against the victim. He explained that reasons for the victim's untruthfulness included her refusal to accept discipline from him and his lack of attention after the birth of his son. On cross-examination the defendant denied that he had noticed any redness around the victim's vagina when he had bathed her but admitted that on one or two occasions the victim had told him that the area burned. He added that the victim had at times threatened him with telling her mother that he was "messing with" her (the victim). These threats allegedly occurred when the victim was not getting her way. Lastly, we note the defendant's admission that on one occasion there had been a discussion about the victim's having blood present on her panties.

State v. Doyle Hart, C.C.A. No. 02C01-9209-CC-00202, Gibson County (Tenn. Crim. App., Jackson, Aug. 11, 1993), perm. to appeal denied, (Tenn. 1993), slip op. at 3-7. Based on the above evidence, the Defendant was convicted of aggravated rape and incest. He was sentenced to an effective term of fifteen years imprisonment. His convictions were affirmed on direct appeal to this Court. Hart, C.C.A. No. 02C01-9209-CC-00202, slip op. at 16.

On May 21, 1993, the victim and her mother, the Defendant's wife, gave sworn statements to defense counsel. The victim's sworn statement was, in essence, a recantation of her trial testimony. She stated that the Defendant had

never raped or sexually abused her. Instead, she claimed that her stepbrother (apparently her stepmother's son) had sexually abused her. She stated that she had blamed the Defendant for the abuse to avoid getting in trouble with her father and stepmother. She also admitted that she had been jealous of the attention paid to the Defendant's son, her stepbrother.

As a result of these sworn statements, the Defendant filed a petition for a writ of error coram nobis on November 24, 1993. In the petition, he contended that the victim had recanted her trial testimony. He attached the sworn statements of the victim and her mother to the petition and requested that the trial court grant him a new trial based upon the newly discovered evidence. The trial court conducted an evidentiary hearing on the petition on April 8, 1994.

At that hearing, the victim stated that she "was telling a story" when she testified at trial that the Defendant had sexually abused her. She gave several reasons why she had testified untruthfully at trial. Among those reasons were that she had had dreams about someone sexually abusing her, that her friends were saying that they had had sex and she wanted to be a part of the group, that she now understood that testifying untruthfully at trial was wrong, and that her stepmother told her to blame the Defendant when the victim informed her that she had been sexually abused by her stepbrother (the stepmother's son).

On cross-examination, the victim admitted that although she had been hospitalized for several weeks after the trial, she had never informed any of her counselors that she had lied while testifying. In addition, the victim related that after giving the sworn statement to defense counsel in May of 1993, she talked

-6-

to a Department of Human Services (DHS) official about having testified untruthfully at trial. The DHS official doubted her recantation, and the victim became upset and refused to talk with the official a second time. Furthermore, the victim denied ever having been sexually abused by anyone, including the Defendant, in spite of the medical evidence indicating signs of sexual abuse or activity.

The victim's mother, Lisa Hart, also testified at the hearing conducted on April 8, 1994. She stated that she and the Defendant were still married but that she had filed for divorce. After the Defendant's trial in 1992, the victim lived with her father and stepmother for a period of time. In February of 1993, shortly before giving the sworn statement to defense counsel, the victim moved back in with Hart. Hart testified that after a few weeks the victim began to initiate conversations about the Defendant's trial. Eventually the victim informed Hart that she had lied at trial, and they then informed defense counsel. Hart denied pressuring the victim to recant. On cross-examination, Hart admitted that she doubted the victim's claim of sexual abuse because "there was not enough facts for [her] to accept it."

After considering the evidence presented at the hearing, the trial court denied the petition. In written findings of fact, the trial judge found that the victim's recantation was due to pressure from her mother, Lisa Hart. Hart, 911 S.W.2d at 373. On appeal, however, a panel of this Court concluded that the trial judge had considered inadmissible evidence and evidence outside the record in arriving at his decision to deny the petition. Id. at 373-74. Accordingly, the trial

court's judgment was reversed and the case remanded for a new hearing. Id. at 378.

A new hearing was conducted by a different trial judge on July 8, 1996. The victim's mother, Lisa Hart, testified at this hearing. Her testimony was substantially the same as her testimony from the April, 1994 hearing. She related that the victim had been living with her father during and immediately after the Defendant's trial but moved back in with her shortly before giving the sworn statement of recantation to defense counsel in May of 1993. Hart testified that she did not pressure the victim to recant.

Vonda Borden, a former employee of the West Tennessee Behavioral Center, testified that she counseled the victim in the spring of 1994 before the first coram nobis hearing. Borden stated that the victim reported that she had lied at trial because she was jealous of her baby brother and the Defendant, her stepfather, had disciplined her and had broken promises to her. The victim stated further that she had had dreams in which the Defendant sexually abused her and she reported them as reality because her friends were claiming that they had had sex and she wanted to be like them. Borden also confirmed that the victim was anxious and fearful of testifying in court at the first coram nobis hearing. On cross-examination, Borden admitted that it was not unusual for child victims to recant in the manner in which occurred in the present case.

The Defendant offered no further live testimony after Borden. Instead, the Defendant offered a portion of the original trial testimony and a portion of the testimony from the first coram nobis hearing as exhibits. He relied on the victim's

sworn statement and testimony from the first coram nobis hearing as evidence of her recantation.

The State called Dale Jackson, the father of the victim, as a witness at the second coram nobis hearing. Jackson testified that the victim had lived with him immediately after the Defendant's trial. In the spring of 1993, the victim returned to live with her mother. Jackson stated that the victim had never indicated to him any desire to change her trial testimony.

The State then called the victim to testify. She was fourteen years old at the time of the hearing. In essence, the victim recanted her recantation. She stated that she had been telling the truth when she testified at trial that the Defendant had sexually abused her. She reiterated that the sexual abuse had taken place. She testified that she recanted at the first coram nobis hearing because she felt sorry for her mother and her stepbrother in that they were living without the Defendant. She testified further that neither her mother nor the Defendant pressured her to recant.

On July 18, 1996, after reviewing all of the evidence, the trial court filed a memorandum opinion denying the petition. Citing Ross v. State, 130 Tenn. 387, 170 S.W. 1026, 1028 (1914), the trial court noted that recanted testimony is generally looked upon with distrust rather than favor. The trial court specifically found the victim's testimony at the second coram nobis hearing to be credible. Moreover, the trial court also found that the victim's explanation for testifying falsely at the first coram nobis hearing was reasonable and believable.

Accordingly, the trial court denied the petition. In this appeal, the Defendant argues that the trial court erred in denying his petition.

A writ of error coram nobis is available to a defendant in a criminal prosecution. Tenn. Code Ann. § 40-26-105. The remedy is limited, however, to "errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding." Tenn. Code Ann. § 40-26-105. This includes post-conviction proceedings. See Rowe v. State, 498 S.W.2d 322, 325 (Tenn. 1973). A writ of error coram nobis also lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial" when the trial court "determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105; Cole v. State, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of this remedy "is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment." State ex rel. Carlson v. State, 219 Tenn. 80, 85-86, 407 S.W.2d 165, 167 (1966).

A petition for the writ of error coram nobis in a criminal case, which seeks relief on the ground of subsequently or newly discovered evidence, should recite: (a) the grounds and the nature of the newly discovered evidence, Crawford v. Williams, 31 Tenn. (1 Swan) 341, 342 (1851), (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial, Tenn. Code Ann. § 40-26-105, (c) that the petitioner "was without fault in failing to present" the newly discovered

evidence at the appropriate time, see State ex rel. Carlson, 219 Tenn. at 87, 407 S.W.2d at 168, Johnson v. Russell, 218 Tenn. 443, 448, 404 S.W.2d 471, 473 (1966), and (d) the relief sought by the petitioner. Tenn. R. Crim. P. 47. Affidavits should be filed in support of the petition or at some point in time prior to the hearing. See Ross v. State, 130 Tenn. 387, 390-94, 170 S.W. 1026, 1027-28 (1914); State v. Todd, 631 S.W.2d 464, 466-67 (Tenn. Crim. App. 1981).

As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record, see Scruggs v. State, 218 Tenn. 477, 479-80, 404 S.W.2d 485, 486 (1966), or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial, see Hawkins v. State, 220 Tenn. 383, 392, 417 S.W.2d 774, 778 (1967), will not justify the granting of the petition for the writ of error coram nobis when the evidence, if introduced, would not have resulted in a different judgment.

The decision to grant or to deny a petition for the writ of error coram nobis on the ground of subsequently or newly discovered evidence rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988), cert. denied, 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989), overruled on other grounds by Owens v. State, 908 S.W.2d 923, 928 (Tenn. 1995); Jones v. State, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974). Before the petitioner is entitled to relief, it must be established, and the trial court must find, that a defendant "was without fault in failing to present certain evidence at the proper time" and that the subsequently or newly discovered evidence relating to matters litigated at trial "may have

resulted in a different judgment had it been presented at the trial." Tenn. Code Ann. § 40-26-105.

In exercising its discretion, the trial court must determine the credibility of the witnesses who testify in support of the petition for the writ of error coram nobis. If the trial court does not believe that the witnesses presented by the petitioner are credible, the court should deny the application. Conversely, if the witnesses are credible, and the evidence presented would result in a different judgment, the trial court should grant the relief sought.

To determine whether to grant a new trial in cases involving recanted testimony, the test is as follows: "(1) Is the trial judge reasonably well satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) was the defendant reasonably diligent in discovering the new evidence, or surprised by false testimony, or unable to know of the falsity until after the trial; and (3) might the jury have reached a different conclusion had the truth been told." State v. Phillip Lloyd Herndon, C.C.A. No. 03C01-9303-CR-00098, Knox County (Tenn. Crim. App., Knoxville, May 11, 1994). We point out that, as the trial court noted in this case, recanted testimony is looked upon with distrust rather than favor due to the great temptation to strengthen the weak points of the case discovered during the trial by perjury or subornation of perjury. See Ross, 130 Tenn. at 394, 170 S.W. at 1028.

Applying the above precepts to the case sub judice, we can only conclude that the trial court did not err in denying the petition. After reviewing all of the evidence and evaluating the credibility of the witnesses, the trial court specifically

found that the victim's testimony from the July 1996 coram nobis hearing, recanting her earlier recantation, was credible. Obviously the trial court was not reasonably well-satisfied that the testimony given by the victim at the Defendant's trial was false nor that her testimony at the first coram nobis hearing was true. See Herndon, C.C.A. No. 03C01-9303-CR-00098, slip op. at 4. The trial judge was in the best position to make this type of credibility determination. From our review of the record, we do not believe that the trial judge abused his discretion in accrediting the victim's testimony from the July 1996 coram nobis hearing. Accordingly, the Defendant's issue on appeal lacks merit.

For the reasons set forth in the discussion above, we conclude that the trial court did not err in dismissing the Defendant's petition for a writ of error coram nobis. We therefore affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
PAUL G. SUMMERS, JUDGE

_____
JOE G. RILEY, JUDGE